**AKERMAN LLP**
CAROLINE H. MANKEY (SBN 187302)
*caroline.mankey@akerman.com*
CHRISTOPHER N. MCANDREW (SBN 324759)
*chris.mcandrew@akerman.com*
633 W. Fifth Street, Suite 6400, Los Angeles, CA 90071
Telephone: (213) 688-9500
Facsimile:  (213) 627-6342

**JOHNSON & JOHNSON LLP**
NEVILLE L. JOHNSON (SBN 66329)
*njohnson@jjllplaw.com*
HYURA CHOI (SBN 240533)
*hchoi@jjllplaw.com*
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
Telephone: (310) 975-1080 |
Facsimile: (310) 975-1095

Attorneys for Plaintiffs OP-FORTITUDE, LTD.
and SIMON AFRAM

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OP-FORTITUDE LTD., a United Kingdom company, and SIMON AFRAM, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>NETFLIX, INC., a Delaware corporation, and DOES 1-10.<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR (1) CONVERSION; (2) BREACH OF BAILMENT CONTRACT; (3) BREACH OF IMPLIED CONTRACT; DEMAND FOR JURY TRIAL** |

Plaintiff Op-Fortitude ("Op-Fortitude") and Simon Afram (collectively, "Plaintiffs") bring this action against defendant Netflix, Inc. ("Netflix"), and DOES 1-10 (collectively with Netflix, "Defendants"), as follows:

87831098;1

**INTRODUCTION**

1.      On June 15, 2026, at Netflix's request, Plaintiffs' representative hand delivered an unencrypted master copy, suitable for projecting movies in commercial theaters, known as a Digital Cinema Package (the "DCP"), to Netflix's studios in Hollywood. The DCP contained an unreleased, first-to-market, highly anticipated motion picture entitled *Fortitude* (the "Film"). The Film took over seven years and its production cost its producer and financier, Mr. Afram, over $45 million that he personally invested.

2.      The Film is exciting, action-packed, emotional, and based on an incredible true story with far-reaching impacts even today. It was directed by blockbuster director Simon West, stars an all-star ensemble cast, led by Oscar winners Nicolas Cage and Sir Ben Kingsley, alongside Golden Globe winner Ron Perlman, EMMY, BAFTA, GOYA, and Actor Award honorees Matthew Goode, Michael Sheen, Art Malik, Jordi Mollà, and Lukas Haas, as well as Ed Skrein, Alice Eve, Paul Anderson, and Emilio Sakraya, and is tonally in the vein of "*Ocean's Eleven*" meets "*Inglourious Basterds.*" The story centers around one of the main protagonists, Dusko Popov (portrayed by Nicolas Cage), who was a real-life spy during World War II and was the inspiration for Ian Fleming's James Bond novels and films. The secret mission, called Operation FORTITUDE, involved a network of double agents in cooperation with the British Army and Allied Nations who set a trap against Adolf Hitler and his army. The trap deployed strategic deception elements, including a fictitious army complete with fake tanks, aircraft, and ships, film set designers and stage actors, false radio and wireless messages, and much more. Operation FORTITUDE decisively changed the course of World War II and paved the way for a free world. In addition to its all-star director and cast and the dramatic, breathtaking story based on real people and events, the Film is highly unique in that it was shot on 35 millimeter celluloid to make it visually consistent with the time period it represents.

3.      Mr. Afram personally made the substantial investment of time (seven years) and money in the Film because he is passionate about the true story on which it is based and its continuing impact on the modern world, and he has dedicated himself to telling the story to the world, honoring the

87831098;1

AKERMAN LLP
633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

survivors and their family members who contributed to the story, and giving recognition to the cast's outstanding performances.

4.      Based on the early interest from studios and distributors, the Film's high test scores in consumer screen testing, feedback from sales agents, the genre of the Film, and other factors, the Film can be conservatively estimated to at least break even, which in the motion picture industry translates to revenues of at least 2.5 times the production budget, or $112,500,000.

5.      The DCP was delivered to Netflix for the purpose of allowing Netflix to screen and evaluate the Film for a potential purchase. Netflix instructed Plaintiffs that if the DCP was encrypted, it should be unlocked in order for Netflix to screen the Film. After delivering an unencrypted DCP to Netflix, Plaintiffs confirmed to Netflix verbally and in writing that the DCP was unencrypted and instructed Netflix to delete the files after the screening.

6.      After screening the Film on or about June 16, 2026, Netflix failed to provide promised instructions for picking up the unencrypted DCP for over a week. Instead, on the afternoon of June 25, 2026, a Netflix executive emailed Plaintiffs with the subject line, "***Stolen DCP***," referring to Plaintiffs' unencrypted DCP, and wrote, "***someone stole a good amount of drives from our office desks this past week***." (Emphasis added). He further advised that Netflix already had "been working through this with [its] security teams to no luck" and that its piracy teams were "on high alert." Netflix's email indicated that Netflix had known about the theft of the DCP for potentially a full week without ever advising Plaintiffs that Netflix had allowed Plaintiffs' DCP, which cost over $45 million to make, to be stolen right off a Netflix desk. A copy of this email is attached hereto as **Exhibit A**.

7.      Without acknowledging the severity of the loss and Netflix's responsibility for it, the Netflix executive asserted that the stolen drive likely would be sold "for scrap given they would require a KDM," referring to a key to unlock an encrypted DCP. In fact, Netflix knew the DCP was unencrypted and could be opened, viewed, published, copied, or distributed without any such key. The Netflix executive also offered to "create a new DCP" – indicating that Netflix had not followed Plaintiffs' instruction to delete the files from its projection system – "or reimburse you for this missing drive," suggesting that he was attempting to recharacterize the status of the DCP from "stolen" to

AKERMAN LLP
633 WEST FIFTH STREET, SUITE  6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

"missing." Neither of these proposed remedies could compensate for the loss of the Film's unreleased status and first-to-market value.

8.    The Film's value depended in significant part on its exclusivity as an unreleased, first-to-market work. By losing control of the Film, Netflix destroyed that exclusivity and materially, if not completely, impaired the Film's marketability. It is not fathomable that a sophisticated buyer would invest tens of millions of dollars to acquire the Film—and tens of millions more to market it—while facing the constant risk that it could appear online to be viewed widely for free at any time.

9.    The Netflix email advising of the theft also offered "to answer anything further and or connect you with our security team." Since the theft, however, both Netflix and its attorneys have refused to answer any questions about the circumstances of the theft, their supposed investigation, the disposition of the DCP, or even whether Netflix had filed a police report. Netflix's attorneys, too, have attempted recharacterize the DCP as "missing," rather than "stolen." These obfuscations and efforts to change the narrative of the stolen DCP have caused Plaintiffs to suspect that Netflix is suppressing, hiding, and potentially spoliating information and evidence that is highly relevant to the location, disposition, and value of Plaintiffs' unique and tremendously valuable asset.

10.    The resulting damage to Plaintiffs is profound. Through its mishandling of the Film and subsequent dismissiveness, Netflix has jeopardized Plaintiffs' investment of over $45 million and the significant value of the Film itself. Netflix has also deprived the Film, its cast, and its creators of the opportunity to bring their work to market and receive recognition that a properly marketed worldwide release likely would have generated.

### THE PARTIES

11.    Op-Fortitude is, and at all relevant times was, a United Kingdom company with its principal place of business in the United Kingdom.

12.    Mr. Afram is, and at all relevant times was, an individual who is a citizen of the country of Switzerland.

13.    Netflix, Inc. is a Delaware corporation with its principal place of business in Los Gatos, California, and doing business in Hollywood, California.

14.    Plaintiffs are informed and believe that Defendants Does 1 through 10, inclusive, are

AKERMAN LLP

633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

4

**COMPLAINT**

at fault in whole or in part for the claims alleged herein.  The true names, whether corporate, individual, or otherwise of Does 1 through 10, inclusive, are presently unknown to Plaintiffs and, therefore, these Does are being sued by fictitious names, and Plaintiffs will seek leave to amend this Complaint to include the true names and capacities when the same have been ascertained.

15.    Plaintiffs are informed and believe that at all times relevant to this action, each of the Defendants was the agent, affiliate, officer, director, manager, member, principal, alter-ego, and/or employee of the other Defendant and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment, and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged herein with full knowledge of each and every violation of Plaintiffs' rights and the damages to Plaintiffs proximately caused thereby.

<b><u>JURISDICTION AND VENUE</u></b>

16.    This case is brought under 28 U.S.C. Section 1332, because the matter in controversy far exceeds $75,000, exclusive of interest and costs, and is between, on the one hand, Op-Fortitude, which is citizen and/or subject of the United Kingdom, and Mr. Afram, who is a citizen of Switzerland, and on the other hand, Netflix, which is a citizen of the State of California, and unknown DOE defendants who are believed to be one or more individuals who participated in torts committed against Op-Fortitude and are believed to be citizens of California, where all of the conduct giving rise to the claims asserted herein occurred.

17.    Venue is proper in the Central District of California pursuant to 28 U.S.C. Section 1391(b)(2) because a substantial part of the events giving rise to the claim occurred here and pursuant to 28 U.S.C. Section 1391(d) because Defendant Netflix is a corporation subject to personal jurisdiction in California and has contacts within the Central District of California that would subject it to personal jurisdiction in the Central District of California if that district were a separate State.

<b><u>FACTS RELEVANT TO ALL CAUSES OF ACTION</u></b>

**Mr. Afram and the Film**

18.    Mr. Afram is the producer, writer, financier, and filmmaker of the Film at issue. Op-Fortitude is the production company through which the Film was made and is the current owner of

5<br><b>COMPLAINT</b>

87831098;1

AKERMAN LLP
633 WEST FIFTH STREET, SUITE  6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

the Film and its copyrights. Mr. Afram is the sole owner and sole managing director of Op-Fortitude, and he holds rights to share in the net profits generated by the Film.

19. Plaintiffs carefully controlled their sales of the distribution rights so as to maximize the reach, recognition, and success of the Film, including by offering to buyers the opportunity to acquire exclusive worldwide rights and a first-to-market opportunity.  Plaintiffs also controlled the timing in which they took the Film to market so as to ensure a release date that would qualify it for the next awards season. Plaintiffs even dedicated substantial time and meticulous efforts to value and negotiate awards bonuses for a majority of the leading talent in the Film, because the talent, their agents, managers and members of the production team, including Plaintiffs, firmly believe that their outstanding performances would position the talent for awards nominations and wins.

20. The Film has garnered substantial interest from both domestic and foreign distributors. The Film's commercial prospects were independently validated through multiple audience testing by Screen Engine/ASI, LLC, the leading market research firm for the entertainment industry, that yielded 82% Top Two Box scores (comparable to films like "Argo" and "The Imitation Game," not only in audience appeal, but also in genre, budget, cast and content).

**Netflix's Solicitation of the Film and Assumption of Custody of the DCP**

21. On December 9, 2025, Bianca Goodloe, the executive producer of the Film and legal counsel for Mr. Afram, contacted Peter Tupanjanin, a manager at Netflix, by email to pitch the Film to Netflix. Ms. Goodloe included a description of the Film, a list of the director and cast, the status of production, and a link to a sizzle reel for the Film. Mr. Tupanjanin responded that the Film promotional material "looks great," but that a purchase of the rights would require Netflix to screen a working cut of the Film. He also advised that they would "look forward to seeing a cut of the film."

22. On June 11, 2026, Kevin Goetz, the founder and CEO of Screen Engine/ASI, LLC, re-introduced the Film to Netflix by way of an email to Sean Berney, Director of Netflix Original Film. Mr. Goetz's email to Mr. Berney at Netflix made clear that the Film was an unreleased, first-to-market film, stating that: "NOBODY has seen it yet, including any of the agencies, and worldwide rights are available." Jon Harris of Mr. Berney's office at Netflix responded with enthusiasm that very same day and requested to screen the Film on June 16, 2026.

6
**COMPLAINT**

23.    Shortly thereafter on June 11, 2026, another Netflix representative emailed details for delivering the Film to Netflix for a screening on June 16, 2026. Recognizing that pre-release films are highly sensitive and confidential materials that are often encrypted and/or locked to prevent unauthorized access, viewing, and copying, the instruction email stated: "If the DCP is encrypted, please have the keys open from the time the asset lands through EOD on 6/16. This timing allows us to test the content and ensure a streamlined screening." In other words, Netflix expressly requested that the Film's DCP be either unencrypted or unlocked.

24.    To facilitate Netflix's evaluation of the Film, and given the value and confidentiality of the Film, the Associate Producer of the Film, Daniel Haido, advised Netflix that he would personally deliver the DCP of the Film. Mr. Haido and Jon Harris of Netflix arranged for the delivery to be made on Monday, June 15, 2026, at Netflix's Sunset Bronson Studios located at 1455 N. Van Ness Ave., Los Angeles, California 90028. Netflix issued a formal visitor invitation and visitor pass for Mr. Haido to visit Netflix's Sunset Bronson Studios on June 15, 2026 at 10:00 a.m. to make the delivery.

25.    Mr. Harris of Netflix expressly represented in another email on June 11, 2026, that Netflix would take custody of the physical drive, stating: "I'll pick it up from you and deliver to our screenings team."

26.    On June 15, 2026, Mr. Haido personally delivered the DCP to Netflix, and it was accepted by an employee named Michelle. At the time of delivery, Mr. Haido advised Michelle verbally that the DCP was unencrypted and instructed that the files be deleted after the screening. Immediately after the handover, and in writing at 10:03 a.m. that same day, Mr. Haido gave Netflix the explicit instruction that: "The DCP is unencrypted, so please ensure that it is deleted after the screening." For screening purposes, the files on the DCP containing the Film would be copied or ingested into the projector used to screen the Film. Thus, Mr. Haido was requesting that Netflix delete the files from its projector. Mr. Haido also asked to be notified "as soon as" the drive was ready for pickup.

**Netflix's Failure to Return the DCP Despite Repeated Requests**

27.    After first requesting that Netflix advise him "as soon as" the DCP was ready for

87831098;1

pickup, Mr. Haido made repeated, documented requests for the return of the drive. Netflix acknowledged those requests but failed to arrange its return. On June 18, 2026, Netflix postponed a pickup that had been scheduled for June 19, citing the Juneteenth holiday. Netflix then failed to respond when Mr. Haido inquired whether the DCP could instead be collected from the front desk on Saturday. When Netflix still had not made arrangements for the pickup of the DCP more than a week after the June 16 screening, Mr. Haido inquired on June 24 if he could pick up the DCP on June 25, 2026. Netflix did not respond.

28.    Having received no response, Mr. Haido telephoned Netflix's Original Film office directly at approximately 1:02 p.m. on June 25, 2026. Mr. Harris answered and assured Mr. Haido that he would receive pickup instructions within the hour. The call lasted approximately 45 seconds. At 2:24 p.m., after still receiving no confirmation or instructions for picking up the DCP, Mr. Haido memorialized the conversation in an email to Mr. Harris on June 25, 2026, and again requested confirmation that he could retrieve the DCP that afternoon. Mr. Harris did not respond. Less than two hours later, Netflix disclosed for the first time that the drive had, in fact, been "stolen."

**Netflix's Delayed Disclosure of the Theft to Plaintiffs**

29.    At 3:04 p.m. on June 25, 2026, Mr. Berney, Director of Netflix Original Film, sent an email to Mr. Haido and Mr. Goetz with the subject "Stolen DCP." He disclosed, for the first time, that "someone stole a good amount of drives from our office desks this past week." (Emphasis added). Mr. Berney stated that Netflix's security teams had already "been working through this with our security teams to no luck" and that its piracy teams were "on high alert," indicating that Netflix had known about the theft of Plaintiffs' DCP for days or even a full week without advising Plaintiffs of this profound and devastating loss.

30.    Mr. Berney offered in the email  to create a new DCP or to reimburse Plaintiffs for the missing drive, but failed to address the very real  risk that a high quality digital copy of the Film could thereafter be leaked to the public. Instead, Mr. Berney erroneously asserted that the thieves "would require a KDM" (Key Delivery Message) to play the DCP, which was inconsistent with information Netflix had possessed from the outset when Mr. Haido expressly informed Netflix verbally and in writing on June 15, 2026, that, "The DCP is unencrypted" and instructed Netflix to

AKERMAN LLP
633 WEST FIFTH STREET, SUITE  6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

8

ensure that the DCP was deleted after the screening.

31. Because the DCP was unencrypted, no KDM is required to access, copy, view, or distribute the Film. Anyone who obtained possession of the drive immediately acquired access to an unreleased motion picture whose worldwide rights remained unsold. Netflix therefore knew, or at a minimum should have known, when it disclosed the alleged theft that the risk was not hypothetical but immediate and severe.

32. Mr. Berney closed his email stating, "Apologies again and here to answer anything further and or connect you with our security teams." Despite this representation, Netflix has to date failed and refused to provide Plaintiffs with any information about the nature, scope, status, or results of any investigation or other security efforts.

33. Plaintiffs and their counsel repeatedly asked Netflix and its counsel whether Netflix had filed any police report regarding the theft. As of the filing of this Complaint, Netflix and its counsel have refused to disclose to Plaintiffs whether it had filed any police report or enlisted the assistance of any law enforcement agency in investigating a theft of the unencrypted, professional-quality copy of the previously unreleased Film that cost over $45 million and seven years to make and was believed by industry insiders to be likely to earn substantially more than that in revenues – but only if it remained uncompromised and without any risk of leaks or other legal issues – apparently as well as additional digital screening copies of other films. Instead, on July 28, 2026, Netflix tellingly refused Plaintiffs' request that Netflix involve the Los Angeles Police Department, with which Plaintiffs had filed a report regarding the theft, in Netflix's private investigation of the theft.

34. The Film cannot currently be marketed as if it has not been compromised, given the potential buyers' acquisition standards, required disclosures, representations and warranties, and the need for errors and omissions coverage that would be unavailable for a compromised film. Studios and distributors invest millions of dollars into marketing new feature picture releases. They will not buy rights to a film and make a marketing investment of such magnitude for a film that could at any time be released by a third party to the public to view for free and/or otherwise exploited. Thus, any film that does not have a clean chain of title and/or that has not been protected from unauthorized

AKERMAN LLP

633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

9
**COMPLAINT**

publication is likely to either be unsellable or have a dramatically reduced value.

35.    Plaintiffs cannot, consistent with their legal, professional, and ethical obligations, market the Film without disclosing the theft and the resulting loss of exclusive control over the Film. Any such disclosure necessarily diminishes the Film's value and negotiating leverage with prospective purchasers

36.    Disclosing the theft and compromise of the Film's unreleased and exclusive first-to-market status would also necessitate the disclosure of Netflix's lack and/or failure of adequate security protocols, the failure of Netflix's investigation to recover the DCP, identify the thief, or determine the purpose or effect of the theft, and the apparent failure of Netflix to file a police report regarding the "good amount of drives" that were allegedly stolen from its office desks.

37.    Thus, after being advised of the theft of the DCP, Plaintiffs were compelled to temporarily pause their marketing and sales of the Film, despite there being tremendous interest from multiple studios and distributors, both domestic and foreign. The delay caused by pausing sales efforts results in lost opportunities for Plaintiffs, impairment of Plaintiffs' negotiation leverage, and disruption of the Film's release strategy and qualification for awards in this calendar year. The pause also unfairly delays the widespread public release of an award-worthy Film that has tremendous historical significance and the opportunity for the cast's extraordinary performances to receive the recognition and acclaim they deserve.

## FIRST CAUSE OF ACTION

### (Against All Defendants for Conversion)

38.    Plaintiffs incorporate by reference each and every allegation contained in each of the foregoing paragraphs as though fully set forth herein.

39.    Plaintiffs have an ownership interest in and a right to possession of the DCP of the Film.

40.    After being given temporary custody of the DCP for the limited purpose and time in which to conduct a single screening, Netflix has failed to return the DCP to Plaintiffs, and Defendants have exercised dominion over the DCP in a manner that is inconsistent with Plaintiffs' property rights.

AKERMAN LLP
633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

87831098;1

41. Conversion is a strict liability tort; thus, any questions of the Defendants' good faith, lack of knowledge, and motive are immaterial.

42. Under California Civil Code section 3336, Plaintiffs are entitled to recover from Defendants damages calculated based on the detriment caused to the Plaintiffs, including the value of the DCP of the Film at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify Plaintiffs for the loss which is the natural, reasonable and proximate result of the conversion of the DCP.

43. As a result of Defendants' conversion, Plaintiffs have suffered and will continue to suffer damages of at least $105,000,000 for, among other things, the loss of Mr. Afram's more than $45 million investment in the Film, lost commercial sales opportunities and potential lost profits; diminution in the Film's value arising from the need to disclose to prospective buyers and distributers the alleged theft of the unencrypted DCP while in Netflix's custody (and the very real and likely threat of having the unencrypted Film leaked on the internet rendering it a total write-off not only of the cost of the asset but its potential value); impairment of backend participation, ancillary rights, and related business opportunities (including but not limited to merchandising and derivative works); delayed theatrical and distribution release, with attendant loss of awards-season positioning and box-office opportunity; reputational and competitive harm affecting the Film's market position, plus additional amounts according to proof at trial and prejudgment interest, all of which are the natural, reasonable, and proximate results of the conversion of the DCP.

44. In converting Plaintiffs' DCP, Defendants acted willfully, maliciously, oppressively and despicably, and with full knowledge of the adverse effects of their actions on Plaintiffs, including the severe harm that would be caused to the value of the Film. For these reasons, Plaintiffs are entitled to recover punitive and exemplary damages from Defendants pursuant to section 3294(a) of the California Civil Code, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Against Netflix for Breach of Bailment Contract)

45. Plaintiffs incorporate by reference each and every allegation contained in each of the foregoing paragraphs as though fully set forth herein.

AKERMAN LLP
633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

11
**COMPLAINT**

87831098;1

AKERMAN LLP
633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

46.     A bailment contract was formed between Plaintiffs and Netflix when Netflix asked to screen the Film on June 16, 2026, invited a representative of Plaintiffs to facilitate the delivery of the DCP to Netflix, provided written instructions for delivery of the DCP to Netflix, including by stating, "If the DCP is encrypted, please have the keys open from the time the asset lands through EOD on 6/16," provided a visitor's pass to Mr. Haido to deliver the DCP, advised Mr. Haido that Jon Harris of Netflix would "pick it up from you and deliver to our screenings team," accepted delivery of the DCP, and invited Mr. Haido to pick up the DCP after the screening.

47.     As the bailors, Plaintiffs deposited the DCP with Netflix, the bailee, on June 15, 2026, when Mr. Haido delivered the DCP to Netflix's offices, and Netflix assumed physical custody of the DCP.

48.     Plaintiffs made demands for return of the DCP by Netflix in multiple emails requesting permission to pick up the DCP, including, without limitation, on June 17, 18, 24, and 25, 2026.

49.     Netflix failed to return or redeliver the DCP to Plaintiffs.

50.     Netflix owed a duty of care with respect to its care and custody of the DCP. Netflix failed to satisfy this duty by admittedly leaving the DCP – which Netflix knew to be unencrypted -- on an office desk where it could be picked up and stolen, rather than exercising even minimal security measures, such as storing it in a locked or otherwise secured location, storing it in a location monitored by security cameras, requiring a staff member to assume responsibility for its location and security the entire time it was in Netflix's custody, and/or otherwise controlling and tracking its chain of custody. Netflix's failure to exercise such care makes it liable to Plaintiffs for its loss, even if a third person stole the DCP and thus made delivery impossible.

51.     According to Mr. Berney of Netflix, the DCP was stolen from Netflix's offices as part of the alleged theft of "a good amount of drives" from office desks. The fact that multiple drives or DCPs were left unattended and unsecured by Netflix on office desks in a location where they could be stolen confirms that Netflix's careless and negligent treatment of DCPs in its custody was its ordinary custom and practice and that the circumstances of the theft of Plaintiffs' DCP was not an isolated occurrence caused by some unpredictable circumstance or accident that Netflix could not

12
**COMPLAINT**

87831098;1

have prevented. On the contrary, Netflix easily could have, and should have, prevented this precise outcome by taking even a modicum of care and security measures.

52.     As a direct and proximate result of Netflix's material breach of the bailment contract, Plaintiffs have suffered and will continue to suffer damages of at least $105,000,000 for, among other things, the loss of Mr. Afram's more than $45 million investment in the Film, lost commercial sales opportunities and potential lost profits; diminution in the Film's value arising from the need to disclose to prospective buyers and distributers the alleged theft of the unencrypted DCP while in Netflix's custody (and the very real and likely threat of having the unencrypted Film leaked on the internet rendering it a total write-off not only of the cost of the asset but its potential value); impairment of backend participation, ancillary rights, and related business opportunities (including but not limited to merchandising and derivative works); delayed theatrical and distribution release, with attendant loss of awards-season positioning and box-office opportunity; reputational and competitive harm affecting the Film's market position, plus additional amounts according to proof at trial and prejudgment interest.

### THIRD CAUSE OF ACTION

(Against Netflix for Breach of Implied Contract)

53.     Plaintiffs incorporate by reference each and every allegation contained in each of the foregoing paragraphs as though fully set forth herein.

54.     An implied contract was created between Netflix and Plaintiffs when Netflix asked to screen the Film on June 16, 2026, invited Plaintiffs to send a representative to facilitate the hand delivery of the DCP to Netflix, provided written instructions for delivery of the DCP to Netflix, including by stating, "If the DCP is encrypted, please have the keys open from the time the asset lands through EOD on 6/16," provided a visitor's pass to Mr. Haido to deliver the DCP, advised Mr. Haido that Jon Harris of Netflix would "pick it up from you and deliver to our screenings team," accepted delivery of the DCP, and invited Mr. Haido to pick up the DCP after the screening. In requesting that the DCP be unencrypted or unlocked, and assuming custody of the DCP knowing that it was unencrypted, knowing that it was a first-to-market film, and knowing the importance of protecting the contents of the DCP from unauthorized copying, publication, piracy, and exploitation,

13
**COMPLAINT**

87831098;1

AKERMAN LLP

633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Netflix impliedly agreed to protect the confidentiality of the DCP.

55.     At the time of delivery, Mr. Haido advised Netflix, both orally and in writing, that the DCP was unencrypted and instructed Netflix to delete it after the screening. Netflix assumed custody of the DCP and did not at any time object to Mr. Haido's instruction or to assuming custody of and responsibility for the unencrypted DCP, thereby impliedly agreeing to those terms.

56.     After accepting custody of the unencrypted DCP containing master files of the previously unreleased and first-to-market Film, which Netflix knew by its nature to be unique, irreplaceable, and of potentially enormous commercial value, Netflix breached the implied contract by recklessly, carelessly, and negligently failing to protect the confidentiality and security of the DCP. Netflix left the DCP – which Netflix knew to be unencrypted -- on an office desk where it could be picked up and stolen, rather than exercising even minimal security measures, such as storing it in a vault or other locked and secured location, storing it in a location monitored by security cameras, requiring a staff member to assume responsibility for its location and security the entire time it was in Netflix's custody, strictly restricting access to the DCP and all locations in which it was stored, and/or otherwise controlling and tracking its chain of custody.

57.     Netflix also breached the implied contract by failing to follow Mr. Haido's instruction to delete the files of the Film after its screening. In his June 25 email, Mr. Berney offered to "create a new DCP" for the Film, which indicates Netflix's continued possession of digital files from which such a DCP could be generated.

58.     As a direct and proximate result of Netflix's material breaches of the implied contract, Plaintiffs have suffered and will continue to suffer both property loss in the form of the loss of the DCP, and economic damages of at least $105,000,000 for, among other things, the loss of Mr. Afram's more than $45 million investment in the Film, lost commercial sales opportunities and potential lost profits; diminution in the Film's value, arising from the need to disclose to prospective buyers and distributers the alleged theft of the unencrypted DCP while in Netflix's custody (and the very real and likely threat of having the unencrypted Film leaked on the internet rendering it a total write-off not only of the cost of the asset but its potential value); impairment of backend participation, ancillary rights, and related business opportunities (including but not limited to

87831098;1

merchandising and derivative works); delayed theatrical and distribution release, with attendant loss of awards-season positioning and box-office opportunity; reputational and competitive harm affecting the Film's market position, plus additional amounts according to proof at trial and prejudgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

1.      Economic damages of at least $105,000,000, plus additional amounts according to proof at trial,

2.      Prejudgment and post-judgment interest at the legal rate;

3.      Punitive and exemplary damages in an amount to be determined at trial;

4.      An award of costs and attorney's fees incurred in this action; and

5.      For such additional and further relief as is just and proper.

DATED:  July 29, 2026                    **AKERMAN LLP**

By: _____
Caroline H. Mankey
Christopher N. McAndrew
Attorneys for Plaintiffs
OP-FORTITUDE LTD. and SIMON AFRAM

**AKERMAN LLP**
633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

15
**COMPLAINT**

87831098;1

**DEMAND FOR JURY TRIAL**

Plaintiffs Op-Fortitude Ltd. and Simon Afram hereby demand a trial by jury on all issues triable by jury.

DATED:  July 29, 2026                                **AKERMAN LLP**

By: _____
Caroline H. Mankey
Christopher N. McAndrew
Attorneys for Plaintiffs
OP-FORTITUDE LTD. and SIMON AFRAM

16
**COMPLAINT**

87831098;1

AKERMAN LLP

633 WEST FIFTH STREET, SUITE 6400
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342